## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

SUZANNE BORZAK                    :
                                  :              No. 19-cv-5716-JMY
            v.                    :
                                  :
CITY OF BETHLEHEM, ALICIA KARNER  :
AND DARLENE HELLER.

### MEMORANDUM

YOUNGE, J.                                              December 23, 2021

Currently before the Court is Defendants' motion for summary judgment.  (Motion for Summary Judgement (hereinafter "MSJ"), ECF No. 12.)  For the reasons stated in this Memorandum, Defendants' motion will be granted, and Plaintiff's Complaint will be dismissed.

### I.      PROCEDURAL AND FACTUAL BACKGROUND:

### A.      Procedural Background:

Borzak brought this employment discrimination action after she was terminated, on January 4, 2019, from her job as the Zoning Officer for the City of Bethlehem.  (Complaint, ECF No. 1.)  In the Complaint, she seeks, *inter alia*, an award of damages, declaratory and injunctive relief, and attorney's fees based on six separate theories set forth in Counts I through VI of the Complaint.  In Count I of the Complaint, Borzak proceeds on the theory that Defendants violated her constitutional protected right to political association under the First and Fourteenth Amendments.  (*Id.* ¶¶ 61-64.)  In Count II of the Complaint, Borzak proceeds on the theory that Defendants' decision to terminate her employment violated her rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615(a)(1).  (*Id.* ¶¶ 65-68.)  In Count III and VI of the Complaint, she proceeds on the theory that Defendants' decision to terminate her employment was based on age discrimination in violation of Title VII and the Pennsylvania Human Relations

Act (hereinafter "PHRA"), 43 Pa. C.S. § 951 *et seq*. (*Id*. ¶¶ 69-71, 78-81.) In Count IV and VI of the Complaint, Borzak proceeds on the theory that Defendants' decision to terminate her employment was based on gender discrimination in violation of Title VII and the PHRA. (*Id*. ¶¶ 72-74, 78-81.) In Counts V and VI of the Complaint, Borzak advances the theory that she was terminated without cause because of her disabling medical condition in violation of the Americans with Disabilities Act and the PHRA. (*Id*. ¶¶ 75-77, 78-81.)

**B.   Factual Background:**

As will be described in more detail herein, Borzak's case is primarily based on unsupported factual assertions that amount to hearsay and innuendo. Borzak offers side-stories and gossip in an attempt to establish a circumstantial case of perceived political patronage or affiliation discrimination. She offers no direct evidence to establish that Defendants were politically motivated in their decision to terminate her from her position as the Zoning Officer for the City of Bethlehem; instead, she offers her own self-serving unsupported assumptions and those of her friend Lucy Lennon.

At the time when this action transpired, Alicia Karner was the Director of the Department of Community and Economic Development within the City of Bethlehem. (Karner Deposition p. 7, SJM Ex. W, ECF No.12-7.) In this role, she oversaw a number of bureaus that comprised the Department of Community and Economic Development which included the bureaus of Planning & Zoning, Code Enforcement, Housing Inspections, Community Development, and Recycling. (*Id*. p. 8.) Karner was appointed to this position by Mayor Robert Donchez in January of 2014 after his Democratic administration took office. (*Id*. pp. 8, 24, 25, 34.) Karner's appointment was announced in November of 2013 after Mayor Donchez prevailed in that election cycle. (*Id*.)

The Deputy Director of Community and Economic Development was Amy Burkhart.  (Burkhart Deposition p. 7, SJM Ex. Y, ECF No. 12-9.)

Darlene L. Heller, AICP, was the director for the bureau of Zoning & Planning which fell within the Department of Community and Economic Development.  (Heller Deposition p. 8, SJM Ex. X, ECF No. 12-7.)  At deposition, she testified that she held that position for around eighteen years.  (*Id.*)  Heller was Borzak's immediate supervisor when Borzak was the Zoning Officer for the City of Bethlehem.  (*Id.* p. 17.)  Tracy E. Samuelson was the assistant director for the bureau of Planning and Zoning, and at the time of her deposition, she testified that she held that position for almost eighteen years.  (Samuelson Deposition p. 7, SJM Ex. Z, ECF No. 12-9.)

Borzak was a registered Republican but was never actively involved in Republican Party politics.  (Borzak Deposition p. 86, MSJ Ex. S, ECF No. 12-4; Pl.'s Resp. to SMF ¶ 36; Complaint ¶ 15.)  Borzak began working for the City of Bethlehem in 2004 as a permit coordinator.  She was then promoted to Inspector and ultimately became the Zoning Officer in 2012. (Borzak Deposition p. 41; SMF ¶ 4.)  Borzak was terminated from her position as the Zoning Officer on January 4, 2019.  (Pl.'s Resp to SMF ¶ 29; ECF No. 13-1.)  After Borzak was terminated, she was replaced by a male who was around 44 years old at the time he was hired or around ten years younger than herself.  (Pl.'s Resp. to SMF ¶ 5.)  In relationship to her gender discrimination claim, Borzak alleges that Karner had a preference for hiring males and frequently gave male employees favorable performance reviews.  (Opp. Brief page 15; Complaint ¶¶ 47-48.)

Borzak had a health condition that involved coronary artery spasms, and when she had spasms she would have a coworker, usually Jody Cosenzo, sit with her and time the spasms to ensure that she did not lose consciousness and keep track of the time between the spasms.

(Borzak Deposition p. 166; Pl.'s SMF  61.)  If the episode lasted more than 25 minutes, there was a chance that Borzak could have a heart attack.  (*Id.*, Pl.'s SMF ¶ 64.)  Borzak experienced at least 15 episodes that required monitoring during her tenure with the City of Bethlehem, (*Id.* p. 164), and she was transported from work by ambulance on at least two occasions.  (*Id.* pp. 167, 190.)  Borzak testified that after she experienced an episode, her supervisor, Heller, would tell her to leave work and go home for the day.  (Borzak Deposition p. 169, 171.)  She went on FMLA leave on January 3, 2019 and was terminated the next day.  (SFM ¶29.)

An understanding of Borzak's relationship with Lucy Lennon is necessary to understand her theory of perceived political patronage or affiliation discrimination.  At the time when the relevant facts to this litigation transpired, Borzak was friendly with Lennon.  According to Borzak, her problems at work began when Karner saw her having lunch with Lennon in October of 2017.  (Lennon Affidavit ¶¶ 59-62.)  Lennon was a realtor who focused on residential and commercial real estate sales in the Lehigh Valley with a particular focus on the City of Bethlehem.  (*Id.* ¶ 4.)  She also acted as a landlord's agent with respect to rental properties owned by her clients (*Id.* ¶ 3), and Lennon was the leasing agent for the commercial landlord who leased commercial space to Clusters—a local popcorn and candy store that was purportedly owned by a Republican.  (*Id.* ¶ 76.)  As will be explained in more detail below, Clusters' relevance to this action arises from an incident that occurred during MusikFest in 2018 when people associated with the Democratic party setup an anti-Trump table-booth on the sidewalk in front of Clusters that allegedly blocked the entrance.  (*Id.*)

Lennon prepared an affidavit in connection with this litigation in which she attested to her belief that Karner did not like her and would target her projects.[1]  (*Id.* ¶¶ 19, 33-37, 60.)

---

[1]  Lennon specifically referenced a deal that she put together to sell the Boyd Theatre for three million dollars to a developer that ultimately backed out of the deal when Karner allegedly expressed interest in obtaining the Theatre

Lennon avers that the animosity between the two women stems from a 2013 political campaign for County Executive in Northampton County in which the women supported opposing candidates.  (*Id.* ¶¶ 6-24.)  Lennon supported John Brown for County Executive while Karner allegedly supported John Callahan.  (*Id.*)  Callahan the candidate who Karner supported lost the election for County Executive which, according to Lennon, meant that Karner was not appointed as Director of Economic Development for Northampton County.  (*Id.* ¶ 21.)  Instead, Karner was appointed to a position as Director of Economic Development for the City of Bethlehem after Robert Donchez was elected as the Mayor of the City of Bethlehem in the 2013 election cycle— according to Lennon.  (*Id.* ¶ 24.)

In relationship to her perceived political patronage or affiliation claim, Borzak alleges that part of the reason she was terminated was because Karner did not like Lennon, and Karner discovered that she had a relationship with Lennon when she saw the two women having lunch together in October of 2017.  Borzak also relates her termination to her attempt to assist the owner of Clusters when individuals associated with the Democratic party setup and an anti-Trump table-booth in front of the store during MusikFest in August of 2018.  (Pl.'s Resp. to SMF ¶¶ 31-32.)

By way of background, MusikFest is a city-wide, multi-venue music and arts festival. The merchants in Bethlehem derive a significant part of their annual income from MusikFest.  A controversy occurred during MusikFest in 2017, when a table-booth was setup outside Clusters. (Lennon Affidavit ¶¶ 70-73, Response in Opposition (hereinafter "Opposition"), Ex. 1, ECF No. 13-3.)  According to Lucy Lennon, the table setup was anti-Trump and associated with the Democratic Party.  (*Id.*)  The merchant who owned Clusters complained that the table was

---

through the City's blighted properties program.  (Lennon Deposition ¶¶ 38-43.)  Lennon also referred instances where Karner allegedly revoked permits that her clients had obtained to operate businesses.  (*Id.* ¶¶ 44, 54, 57.)

blocking entry and causing a problem.  (*Id.*)  In August 2018, the same group received a non-zoning permit and setup a table in front of Clusters which prompted a renewed complaint from the store's proprietor.  (*Id.*)

On Saturday, August 4, 2018, during MusikFest, Lucy Lennon sent an email to Borzak and other City officials to complain about the anti-Trump table-booth that was allegedly obstructing the entrance to Clusters.  (Lennon Affidavit ¶ 76.)  Lennon's email copied Mayor Donchez, the Police Commissioner Mark DiLuzio, and the Administrator of MusikFest.  (*Id.*; Pl's SMF ¶¶ 37, 76-77; Complaint ¶¶ 17-18.)  Plaintiff responded to the email by identifying the type of permit the group had obtained and stated that she would look into the matter on Monday morning.  (Lennon Affidavit ¶¶ 77; Plaintiff's Statement of Material Facts (hereinafter "Pl's SMF") ¶ 38, ECF No. 13-2.)  The proprietor of Clusters eventually appeared in City Hall on several occasions over the course of MusikFest demanding to speak to Mayor Donchez and other City officials about the non-zoning permit allowing a table setup on the sidewalk in front of his store.

Karner testified that the Emergency Management Coordinator, Robert Novatnack, who was overseeing the Northampton County 911 call center during MusikFest, contacted her to complain about Borzak's involvement in the incident.  (Deposition Karner pp. 154-155.)  At Karner's request, Novatnack forwarded to her an email exchange between Borzak and Wade Haubert, the Deputy Director of Emergency Management (911).  (Wade Haubert Email, Ex. J., ECF No. 12-3 p. 64.)  Karner in turn forwarded this email correspondence to Michell Cichocki who was the director of human resources for the City of Bethlehem, and an investigation was opened into Borzak's conduct in connection with the MusikFest matter.  (Deposition Karner p. 154-155; Cichocki Deposition p. 78.)

Borzak was terminated prior to the completion of the human resources' investigation into the MusikFest incident. (Cichocki Deposition p. 78, EX V, ECF No. 12-5 p. 78.) However, the investigation revealed that Borzak had involved herself in a dispute that did not relate to her department, and that she failed to cease involvement at the request of her coworkers who were handling the matter. (*Id.* pp. 70, 78.) The permit at issue during the MusikFest incident involved a non-zoning, right-of-way permit that was issued by the engineering bureau of public works not the zoning department. (*Id.* pp. 70, 78; Karner Deposition p. 159.) Human Resources Director Cichocki testified that she spoke with Wade Haubert who indicated that Borzak released a copy of the right-way-permit to the owner of Clusters. (Cichocki Deposition 80-81; SMF ¶ 56.)

Borzak adamantly disputes the contention that she released a copy of the right-of-way permit to the owner of Clusters. (Response to Defs' SMF ¶ 121, ECF No. 13-1.) She further believes that part of the reason she was terminated was due to her involvement in the MusikFest incident on behalf of the owner of Cluster who she alleges was a Republican. (Pl.'s Resp. SFM ¶ 31, ECF No. 13-1.) She offers statements that were made at a staff meeting to support her contention. (*Id.*) She alleges that at a staff meeting, Heller and Tracy Samuelson told her that she should not have been sticking her nose into the MusikFest incident because the table was allowed to be on the sidewalk and that Republicans caused similar problems at one point in time. (*Id.*) The MusikFest incident was a factor in the decision to terminate Borzak's employment; however, it was not the only factor. (MSJ p. 4.)

Separate and apart from the MusikFest incident, Borzak was involved in several work-related infractions over the course of her tenure with the City of Bethlehem which, according to Defendants, ultimately lead to her dismissal. For example, on November 3, 2014, Borzak was written up by her supervisor for acting outside her role as a Zoning Officer in connection with a

Code Board of Appeals enforcement action and for discussing confidential personnel matters inside and outside of City Hall. (Defendants' Statement of Material Facts (hereinafter "Defs' SMF") ¶ 6, ECF No. 12-2.) Again, on December 15, 2016, disciplinary action was taken against Borzak for insubordination and for releasing documents to an individual in deliberate refusal to carry out an order from her supervisor not to do so. (Employee Warning, MSJ Ex. I, ECF No. 12-3 p. 62.) In the 2016 incident, Borzak released an inspection report to an attorney named Dennis Benner in an email chain that included Lucy Lennon. (*Id.*, Borzak Deposition pp. 104-105.) Borzak was suspended for two days without pay and warned that if incidents of the type occurred again it may result in termination of her employment with the City of Bethlehem. (Employee Warning.) As a result of the investigation, it was determined that an inspection report was not something that Borzak would prepare as a Zoning Officer. (*Id.*) In connection with the 2016 incident, Borzak's supervisor Darlene Heller, testified that she specifically called Borzak on the phone and asked her not to release the information in question because Mayor Donchez had not finished reviewing the project. (Heller Deposition pp. 62, 74; Karner Deposition p. 77.)

On October 31, 2018, a local business owner named Jenifer DeJesus filed a harassment complaint against Borzak which was referred to human resources for an investigation. (Cichocki Deposition p. 94.) This harassment complaint stemmed from a zoning dispute concerning a business that DeJesus was attempting to open in Bethlehem. In relationship to this harassment complaint, Karner avers that she specifically instructed Borzak not to meet with DeJesus alone. (Karner Deposition p. 105.) Therefore, Amy Burkhart attended the meeting between Borzak and DeJesus. (*Id.* p. 107.) However, Burkhart provided a statement in which she attests to the fact

that during the meeting, Borzak and DeJuses held a private discussion in a backroom.  Borzak

claims that Karner never told her not to meet with DeJesus alone.

Both Karner and Heller testified to an established policy within the zoning department

under which employees of the zoning department were to have a coworker accompanying them

during meetings with developers, property owners and similar individuals.  (Heller Deposition

pp. 79-83; Karner Deposition pp. 107-108.)  Borzak disputes the scope of Mayor Donchez policy

on private one-on-one meetings—whether such a policy existed and whether it applied to her as

a Zoning Officer.  (Opposition to Defs' SMF ¶ 42.)  HR Director Cichocki ultimately reached the

conclusion that it was inappropriate for Borzak to have a one-on-one conversation with DeJesus

after being instructed not to do so.  (Cichocki Deposition p. 94.)  Karner testified that the

incident with DeJesus factored into the decision to terminate Borzak along with the 2016 release

of information.  (Karner Deposition pp. 118, 120.)

The witnesses who were deposed in connection with this litigation also identified serious

deficiencies in Borzak's ability to interpret and apply zoning ordinances.  They identified several

specific instances when Borzak misinterpreted zoning ordinances or interpreted them too

narrowly.  (Karner Deposition pp. 88-89, 91; Heller Deposition pp. 86-87; Cichocki Deposition

p. 97.)  The witnesses further testified that Borzak would provide her personal interpretation to

members of the public without vetting the issue with other staff members to ensure accuracy and

consensus within the zoning department on matters of interpretation.  (Karner Deposition pp. 88-

89, 91; Chichicki Deposition p. 125.)  Both Karner and Heller referenced an instance that

involved Steel City Realty on Broad Street in which Borzak issued Certificates of Occupancy

that she later revoked based on a mistake that she had made when reviewing the facts in the

zoning application.  (Karner Deposition pp. 93, 95; Heller Deposition pp. 86-87.)  The project

ultimately required a Zoning Board Hearing along with a variance prior to approval.  (Karner Deposition p. 93; Heller Deposition pp. 77, 86-87.)

Heller specifically testified that she had spoken to Borzak about her feeling that Borzak was devoting too much energy to projects that were outside of the scope of her role as a zoning officer at the expense of tasks that she was assigned to complete.  (Heller Deposition pp. 77, 86-87.)  On at least one occasion, the human resources director, Cichocki was called in to mediate a dispute over a zoning matter between Heller and Borzak.  (Cichocki Deposition p. 123.)  Borzak did not receive a work-related evaluation in 2017 or 2018.  (Complaint ¶ 48.)  In early October 2018, Borzak was out of work for five or six days on funeral leave when numerous mistakes and inaccuracies were found in her work.  (MSJ, Ex. M.)  Borzak argues that the mistakes identified were more an issue of her interpretation of zoning ordinances that conflicted with other people's interpretation of the zoning ordinance.  However, the mistakes found in October 2018 reinforced other issues with Borzak's performance and work-product over the years.  (Karner Deposition pp. 119-122.)

When questioned about why she decided to terminate Borzak, Karner referenced the DeJesus harassment complaint, the incident that occurred in 2016 and then testified, "So that happened in 2016.  The misinterpretations were happening throughout her employment.  So there was these two competing forces of lack of trust because of the release of information and insubordination.  And then, I guess, ultimately [a] similar lack of the ability to trust some of the zoning interpretation."  (Karner Deposition pp. 120-121.)  Human resources director Cichocki testified, "It was more a pattern of behavior, a lack of trust, a lack of comfort with her accuracy and ongoing issues that we felt it was necessary, instead of doing a last chance, to terminate and find another person for that position."  (Cichocki Deposition p. 136.)

In 2014, Borzak filed a sexual harassment complaint against a male coworker who was later terminated.  (Complaint ¶¶ 49-50.).   She was also known to escort other coworkers to human resources to file complaints.  (Cichocki Deposition pp. 14, 18.)  Karner testified that "Suzanne – and I think I referenced this before – escorted other employees to HR to make complaints about, you know, each other.  I knew that there were times where she would visit the law bureau to try to further evaluate a situation after what seemed like being unhappy with the direction provided by Darlene [Heller] and Tracey [Samuelson] in their staff meetings."  (Karner Deposition pp. 170, 172.)

## II.   LEGAL STANDARD ON SUMMARY JUDGMENT:

In reviewing a motion for summary judgment, a court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 255.

The movant bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of

a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). A factual dispute is "material" if it might well affect the outcome of the case under governing law. *Id*. (citing *Anderson*, 477 U.S. at 248).

A court must view the facts and draw all reasonable inferences in the non-moving party's favor. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004); *see also Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) ("In evaluating the evidence, we are required to view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion."). Nonetheless, a court need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## III.   DISCUSSION:

The perceived political patronage or affiliation discrimination action brought by Borzak has several flaws, the most prominent of which is that it is primarily based upon unsupported factual assertion that amount to hearsay and innuendo. Borzak never really explains or provides evidence of why Karner's alleged conflict with or animus towards Lennon was the prime motivating factor in a decision to discriminate against her and to ultimately terminate her employment. Furthermore, her unsupported, even fanciful assertions that this entire conflict stems from a 2013 campaign for County Executive (involving two men, neither of whom are even remotely involved in any way with this litigation) as well as Brozak's mere speculation that Karner seeing her enjoy a lunch date with Lennon provoked Karner to violate the law, strains

12

credulity.  Other than Lucy Lennon's unsupported allegations, there is no relevant evidence to support the proposition that Karner would exercise her authority to revoke permits to operate businesses that were issued to local merchants simply because the local merchant was represented by Lennon.  For reasons that will be explained in more detail below, Borzak's gender, age and disability discrimination claims are equally weak because these claims rely on passing comments or isolated events that fail to establish any direct claim for employment discrimination.  Therefore, Borzak advances a circumstantial case that is simply unsupported by the evidence.

A.      **Borzak Fails to Establish a Viable Claim for Political Patronage (Affiliation) Discrimination in Violation of the First and Fourteenth Amendment under 42 U.S.C. § 1983.**

Based on Borzak's relationship with Lucy Lennon and Borzak's involvement in the MusikFest incident, she advances a claim for perceived political patronage or affiliation discrimination in violation of the First and Fourteenth Amendment.  However, Borzak's claim for political affiliation discrimination fails primarily because she cannot establish that the legitimate non-discriminatory justification for her termination was merely a pretextual excuse for Defendants to engage in political discrimination.  Defendants identified a pattern of work-related infractions and deficiencies over the course of Borzak's tenure with the City of Bethlehem which led to her termination.  Borzak's claim is equally deficient because her relationship with Lucy Lennon and Borzak's involvement in the MusikFest incident are insufficient to establish a prima facie case of employment discrimination based on a theory of political patronage or affiliation discrimination.

In *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013), the Third Circuit explained that a political association retaliation claim under the First Amendment has its origins

in the Supreme Court's "trilogy" of "political patronage" cases. *Branti v. Finkel*, 445 U.S. 507 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 663 (3d Cir. 2002) (citing *Elrod v. Burns*, 427 U.S. 347 (1976) (holding that termination of public employees' employment because of their political affiliation violates the First Amendment unless the position at issue involves policy making).

From these cases and their progeny, the Third Circuit has developed a tripartite test to determine whether a government employee has been the victim of discrimination based on political affiliation in violation of the First Amendment. *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). First, the plaintiff must establish that "she was employed at a public agency in a position that does not require political affiliation." *Id.* Second, the plaintiff must show she engaged in constitutionally protected conduct under the First Amendment. *Id.* Finally, the plaintiff must prove that the constitutionally-protected conduct was a substantial or motivating factor for the adverse employment action. *Id.*

In *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994), the Court held that in Title VII employment discrimination cases, to "defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." This holding is based upon the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which essentially states that a plaintiff in a Title VII discrimination case carries the initial burden of establishing a *prima facie* case of discrimination. *Id.* Once the plaintiff proves his *prima facie* case, the burden then shifts to the

employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."

*Id.*  If the employer satisfies this burden, the burden of production returns to the plaintiff, who

must show by competent evidence that the employer's reason(s) for rejection were pretextual.

*Id*. at 804-05.

 While the above-mentioned burden-shifting framework was set forth in the context of

Title VII, the Supreme Court has stated that the framework applies to Section 1983 actions, and

the Third Circuit has applied it to Section 1983 discrimination cases.  *St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 506 (1993) (assuming the *McDonnell Douglas* framework applies to 42

U.S.C. §1983 claims); *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir.

1997) (finding the *McDonnell Douglas* framework applicable to racial discrimination under 42

U.S.C. §1983).

 The Third Circuit, in *Wheeler v. Township of Edison*, 326 F. App'x 118, 121 (3d Cir.

2009), applied the burden-shifting framework in a Section 1983 political patronage

discrimination case that is similar to the case *sub judice*, and is relevant to the court's analysis.

While *Wheeler* is a non-precedential case and therefore non-binding authority, this court finds its

rationale and application of the burden-shifting framework extremely persuasive.  The *Wheeler*

Court addressed and resolved precisely how the *McDonnell Douglas* framework and the holding

in *Fuentes* apply to political patronage claims:

> Political discrimination cases employ similar, though not identical, burden-shifting
> mechanisms as those used in other employment discrimination contexts, such as
> Title VII cases.  *See Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997).  First
> the plaintiff must make out a prima facie case.  We apply a three-part test to
> establish a prima facie political patronage claim.  The plaintiff must show that (1)
> she was employed at a public agency in a position that does not require political
> affiliation, (2) she was engaged in constitutionally protected conduct and (3) this
> conduct was a substantial or motivating factor in the government's employment
> decision.  *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir.
> 2007).

> Once the plaintiff has made this prima facie case, the employer may avoid liability by proving, by a preponderance of the evidence, that the same employment actions would have been taken even in the absence of the protected activity. *Stephens*, 122 F.3d at 176. Once the employer has articulated a nondiscriminatory reason for the employment action, the plaintiff may still prevail by discrediting that proffered reason, either circumstantially or directly, or by proving that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994).

*Wheeler v. Twp. of Edison*, 326 F. App'x 118, 121 (3d Cir. 2009).

Borzak's relationship with Lennon or her involvement in the MusikFest incident falls short of establishing the second or third elements of the test that is necessary to establish a prima facie case of employment discrimination based on political patronage under *Elrod*, *Galli* and related cases. Borzak cannot establish that she engaged in constitutionally protected behavior or that political affiliation was a substantial or motivating factor for the decision to terminate her from her position as a Zoning Officer.

Borzak cites *Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016), and attempts to establish a claim based on a theory of "perceived-affiliation." In *Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016), the Supreme Court effectively overturned Third Circuit precedent established by *Fogarty v. Boles*, 121 F.3d 886, 888 (3d Cir. 1997) and *Ambrose v. Twp. Of Robinson*, 303 F.3d 488, 495 (3d Cir. 2002) in which the Third Circuit rejected claims based on "perceived-affiliation." In *Heffernan*, a police officer was seen at a political event picking up and carrying a yard sign that he later claimed was for his bed ridden mother. *Heffernan*, 126 S. Ct. at 1416. The police officer was then demoted by his employer despite the fact that he denied any political involvement and essentially claimed that he was merely acting as a courier. *Id*. Based on the fact that the police officer admittedly had not engaged political activity, the Third Circuit upheld the district court's dismissal of an employment discrimination lawsuit that was

16

filed by the police officer. *Id.* Upon review, the Supreme Court reversed and remanded; thereby, recognizing a claim for perceived political affiliation. *Heffernan*, 126 S. Ct. at 1419.

This Court believes that the fact pattern in *Heffernan* is distinguishable from the fact pattern in this action, and that Borzak has failed to establish that she engaged in constitutionally protected conduct. Borzak's relationship with Lennon and the fact that the two were seen having lunch in October 2017 does not establish that she engaged in constitutionally protected conduct for the purpose of making a claim for political patronage discrimination based on a theory of "perceived-affiliation." There is nothing in the record to establish that Lennon held a position as an elected official or that she was seeking to run for office as an elected official. The only definitive reference to Lennon's political involvement that could conceivably be relevant to this case stems from a 2013 campaign for County Executive in Northampton County. This 2013 campaign and the 2017 lunch date were extremely remote from the events that transpired in late 2018 which led to Borzak's termination in January 4, 2019. *Krouse v. American Sterilizer Co*., 126 F.3d 494, 504 (3d Cir Sept. 26, 1997) (absent evidence of intervening antagonism or retaliatory animus, the passage of time may be sufficient to break the causal link between the protected activity and the allegedly retaliatory conduct); *Gulick v. City of Pittston*, No. 12-cv-0141, 995 F. Supp. 2d 322 (M.D. Pa. January 17, 2014) (remote temporal proximity and no pattern of harassment over the period of time is insufficient to prove causation).

Assuming that Karner and Lennon did not like each other and that the two did not in fact get along, this alone simply does not establish a claim for political patronage or affiliation discrimination. There is nothing in the record to indicate that Karner or Heller were targeting Republican employees. Equally, there is nothing in the record to establish that the Democratic

administration in the City of Bethlehem had a policy of terminating Republican employees after Robert Donchez took office in 2013.

Borzak's conduct in relationship to the MusikFest incident in 2018 was work-related in nature; therefore, it was not entitled to protection under the First Amendment. *Williams v. City of Allentown*, No. 17-4910, 2018 U.S. Dist. LEXIS 130451 *12 (E.D. Pa. Aug 3, 2018) (when acting in an official capacity, a public employee does not speak as a citizen and therefore does not have a First Amendment right); *Garcetti v. Ceballos*, 547 U.S. 410 (May 30, 2006) (when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the United States Constitution does not insulate their communications from employer discipline). Borzak simply cannot argue that she was acting as a private citizen when she offered to look into the MusikFest incident on Monday morning. The City of Bethlehem was permitted to investigate Borzak's work-related conduct and determine that she acted inappropriately in connection with the MusikFest incident. Borzak's contention that the Defendants looked into her conduct because she was helping the Republican owner of Clusters and her belief that if Clusters had been Democratically owned, her conduct would not have been investigated, does nothing to change the analysis—her conduct was still work related.

Assuming arguendo, that Borzak was able to establish the necessary elements of the test for political affiliation discrimination, her claim still fails because she has failed to discredit the proffered legitimate justification for her termination offered by Defendants. She fails to establish pretext as required by the *McDonnell Douglas* burden shifting analysis. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). When deciding to terminate Borzak, the Defendants cited to her repetitive mistakes, her lack of attention to detail to her own work, coupled with her antagonism

toward her supervisors, lack of appreciation for the chain of command or supervisory directives, and her release of information to the public at points at which it was not public information, or under circumstances when she was not the appropriate person to provide the documents. (SMF ¶175, 177).

Borzak has failed to come forward with credible evidence to suggest that the reasons offered for her termination were pretextual excuses for political affiliation discrimination. Borzak points to minor inconsistencies in the testimony that do not rise to the level of establishing that the proffered reasons for her dismissal were pretextual in nature. For example, she argues that she did not release the non-zoning, right-of-way permit at issue in the MusikFest incident to the owner of Clusters. She also argues that Karner never told her not to meet DeJesus alone. These inconsistencies do little to counter the fact that complaints related to Borzak's conduct were made in relationship to both incidents. These factual disputes do little to counter the negative criticism of her work made by supervisors and coworkers.

The Defendants do not have to prove that they were correct in all aspects of their decision to terminate. Defendants simply need to prove that the decision made good business sense and that it was not based on any discriminatory animosity. In *Fuentes* the Court wrote:

> To discredit the employer's proffered reason…the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them "unworthy of credence, and hence infer" that the employer did not act for [the asserted] nondiscriminatory reasons.

*Fuentes*, 32 F.3d at 764 (the employer may meet this burden by articulating any legitimate business reason for its action). The defendant need not demonstrate that its decision was actually

based on the proffered reasons, but merely that those reasons exist.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (*citing Board of Trustees v. Sweeney*, 439 U.S. 24, 25 (U.S. 1978)).  The plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  *Keller v. Orix Credit Alliance Inc.*, 130 F.3d 1101, 1109 (3d Cir. Nov. 24, 1997); *Kautz v. Met-Pro Corp*., 412 F.3d 463, 471 (3d Cir. 2005) ("[T]he mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext."); *Ezold v. Wolf, Block Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) (noting that the court does not act as "member [] of an employer's promotion board or committee").

**B.      Plaintiff Has Failed to Establish a Viable Claim for Gender Discrimination in Violation of Title VII and the PHRA.**

Borzak's claim for gender discrimination fails for a reason that is similar to the reason that her political patronage or affiliation claim fails.  Borzak cannot establish that there is a triable issue of material fact on the issue of pretext.  She has not come forward with credible evidence to establish that the legitimate non-discriminatory justification for her termination was merely a pretextual excuse for Defendants to engage in gender discrimination in violation of Title VII and the PHRA.

Title VII makes it unlawful for an employer to discharge or "otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The PHRA similarly provides that it is "an unlawful discriminatory practice . . . [f]or any employer because of . . . race, color, religious creed, . . . age, [or] sex, . . . to . . . discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of

employment." 43 Pa. C.S. § 955(a). Claims brought under Title VII and the PHRA are analyzed

under the same standard. See *Verma v. Univ. of Pa.*, No. 11-611, 2012 U.S. Dist. LEXIS 70333,

*20 (E.D. Pa. May 18, 2012) ("Discrimination claims under the PHRA are subject to the same

standards as Title VII for purposes of summary judgment.") (citing *Jones v. Sch. Dist. of Phila.*,

198 F.3d 403, 409 (3d Cir. 1999))).

To bring a successful claim under Title VII, a plaintiff must prove that "an employer has

'treated [a] particular person less favorably than others because of' a protected trait . . . [and]

'that the defendant had a discriminatory intent or motive'. . . ." *Ricci v. DeStefano*, 557 U.S.

557, 577 (2009). In the absence of direct evidence of discriminatory intent, which is not present

in this case, Title VII discrimination claims are analyzed under the burden-shifting framework

established by *McDonnell Douglas,* 411 U.S. 792. See *Kant v. Seton Hall Univ.*, 289 F. App'x.

564, 566 (3d Cir. 2008).

"Under *McDonnell Douglas*, the plaintiff bears the initial burden of demonstrating a

prima facie case of unlawful discrimination . . . ." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*,

449 F. App'x 209, 213 (3d Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802). In order to

establish a prima facie case of gender discrimination, a plaintiff must ordinarily "show that: (1)

she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an

adverse employment action; and (4) members of the opposite sex were treated more

favorably." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Hugh v. Butler*

*Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).

To survive summary judgment when the employer has articulated a legitimate

nondiscriminatory reason for its action, the plaintiff must:

> point to some evidence, direct or circumstantial, from which a factfinder could
> reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)

> believe that an invidious discriminatory reason was more likely than not a
> motivating or determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 764.  To discredit the employer's articulated reason, the plaintiff need not

produce evidence that necessarily leads to the conclusion that the employer acted for

discriminatory reasons, *Sempier v. Johnson & Higgins*, 45 F.3d 724, 732 (3d Cir. 1995), nor

produce additional evidence beyond her prima facie case, *Fuentes*, 32 F.3d at 764.  The plaintiff

must, however, point to "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder

could rationally find them 'unworthy of credence' "and hence infer that the proffered

nondiscriminatory reason "did not actually motivate" the employer's action.  *Id*. at 764-

765 (quoting *Ezold*, 983 F.2d at 531).  To show that discrimination was more likely than not a

cause for the employer's action, the plaintiff must point to evidence with sufficient probative

force that a factfinder could conclude by a preponderance of the evidence that gender was a

motivating or determinative factor in the employment decision.  *Keller*, 130 F.3d at 1111.  For

example, the plaintiff may show that the employer has previously discriminated against her, that

the employer has discriminated against other persons within the plaintiff's protected class or

within another protected class, or that the employer has treated more favorably similarly situated

persons not within the protected class.  *Fuentes*, 32 F.3d at 765.

  The Court previously addressed Defendants' legitimate non-discriminatory justification

for terminating Borzak when it addressed her claim for political patronage or affiliation

discrimination.  In an attempt to discredit Defendants non-discriminatory justification, Borzak

merely pointed to minor inconsistencies or discrepancies in the testimony that fail to establish an

issue of material fact on the issue of pretext.  As previously discussed, Borzak was unable to call

into question the legitimate non-discriminatory justification for her termination offered by the Defendants.

Plaintiff further alleges gender discrimination is evident based on the fact that Karner and Heller criticized her for "talking too much", being "too helpful" to members of the public, and voicing her opinions.  (Complaint ¶ 52.)  Assuming these comments were in fact made, they simply do not establish gender discrimination or pretextual motive for gender discrimination. The self-serving testimony offered by Borzak to the effect that Karner had a preference for hiring males and gave them favorable performance reviews is equally unpersuasive in proving pretextual motive.  Any inference of gender discrimination in this instance, is rebutted by the fact that the individuals who were directly involved in the decision to terminate Borzak from her position as a Zoning Officer were female.  *Sherrod v. Booker T. Wah. Ctr.*, No. 04-028, 2006 U.S. Dist. LEXIS 102013 *17-18 (W.D. Pa. July 24, 2006) (holding that inference of discrimination was rebutted where the individual who made allegedly racist comments was a member "of the same protected class as plaintiff"); *Dungee v. Northeast Foods, Inc*., No. 95-5824, 940 F. Supp. 682 n.3 (D.N.J. Oct. 3, 1996) (finding that decision-maker's membership in plaintiff's protected class "weakens any compelling evidence of age discrimination").

**C.    Plaintiff Has Failed to Establish a Viable Claim for Age Discrimination in Violation of Title VII and the PHRA.**

Plaintiff alleges age discrimination under Title VII in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, and the Pennsylvania Human Relations Act (PHRA), 43 Pa. C.S. §§ 951-63.  (Complaint (Counts III & VI).)  As previously discussed hereinabove, when addressing Borzak's claim for gender discrimination, claims brought under Title VII and the PHRA are analyzed under the same standard; therefore, the Court will address both claims as one.  See *Verma v. Univ. of Pa.*, No. 11-611, 2012 U.S. Dist. LEXIS 70333,\ *20

(E.D. Pa. May 18, 2012) ("Discrimination claims under the PHRA are subject to the same standards as Title VII for purposes of summary judgment.") (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999))).

To state a claim for age discrimination under the ADEA, a plaintiff must allege that (1) she is over forty, (2) she is qualified for the position in question, (3) she suffered from an adverse employment decision, and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004). The *McDonnel Douglas* burden shifting analysis as set forth by the Third Circuit in *Fuentes*, 32 F.3d at 763, is applicable to Borzak's age discrimination action brought under the ADEA. *Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. December 22, 2019); *Simpson v. Kay Jewelers*, 142 F.3d 639 (3d Cir. 1998) (applying the *McDonald Douglas* burden shifting analysis to age discrimination claims under the ADEA and PHRA).

As previously discussed at length herein, Borzak was unable to overcome Defendants' legitimate non-discriminatory justification for her termination. Therefore, the Court will not belabor this point any further. However, it should be mentioned that Borzak's prima facie case for age discrimination is extremely questionable. She lacks the requisite evidence to establish the fourth element of the test that must be satisfied to establish an inference of age discrimination. In this instance, Borzak was 55 at the time of her dismissal and her replacement was believed to be around 44 at the time he was hired. This ten-year age differential is not compelling in this instance. *Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n.9 (3d Cir. 200) (affirming dismissal of age discrimination claims where employees who were selected were eight and three years younger than plaintiff).

Nothing in the record established that Defendants had a preference for hiring younger workers.  Borzak's supervisor, Heller, testified that she was 59 at the time of her deposition, (Heller Deposition p. 121.), and Karner's Assistant Director of Planning and Zoning, Tracy Samuelson, testified that she was 63.  (Deposition Samuelson, Ex. Z, pp. 7, 44, ECF No. 12-9 page 29.)  Furthermore, the similarity in age between Heller and Borzak further undermines Borzak's claim of age discrimination.  *Sherrod v. Booker T. Wah. Ctr.*, No. 04-028, 2006 U.S. Dist. LEXIS 102013 (W.D. Pa. July 24, 2006) (holding that inference of discrimination was rebutted where the individual who made allegedly racist comments was a member "of the same protected class as plaintiff"); *Dungee v. Northeast Foods, Inc.*, No. 95-5824, 940 F. Supp. 682 n.3 (D.N.J. 1996) (finding that a decision-maker's membership in plaintiff's protected class "weakens any compelling evidence of age discrimination").

**D.     Plaintiff Has Failed to Establish a Viable Claim for Discrimination Based on Her Disability in Violation of Title VII and the PHRA.**

Borzak claims that Defendants violated the ADA and PHRA when they terminated her without cause because of her disabling medical condition which required accommodation including rest periods and leave.  (Complaint ¶¶ 75-81.)  The ADA bars discrimination against qualified individuals "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a).  The PHRA provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of . . . non-job related handicap or disability. . . to refuse to hire or employ or . . . to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment."  43 Pa. C.S. § 955(a).  "The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under

the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141-42 n.5 (3d Cir. 2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)).

"In order to make out a prima facie case of disability discrimination under the ADA, [a plaintiff] must establish that she (1) has a disability, (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate USA,* 440 F.3d 604, 611 (3d Cir. 2006) (quoting *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002); and citing *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).  Using the *McDonnell Douglas* which is applicable to ADA claims as well as Title VII claims, "[i]f the plaintiff makes a prima facie case, the burden shifts to the defendant to articulate legitimate, non-discriminatory reasons for the adverse employment action." *Mercer v. SEPTA*, 608 F. App'x 60, 64 (3d Cir. 2015) (citing *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000)).  "Once the defendant has provided such a justification, the burden then shifts back to the plaintiff to demonstrate that this stated reason is a mere pretext for discrimination." *Id.* at 64-65 (*citing Shaner*, 204 F.3d at 500).

As previously discussed at length herein, Borzak failed to present credible evidence to refute Defendants' legitimate non-discriminatory justification for her termination.  Therefore, she fails to present an issue of material fact under the *McDonnell Douglas* burden shifting analysis on her age discrimination claim.  Based on the evidence presented in this matter, Borzak also fails to present an issue of material fact as to whether she suffered an adverse employment action because of her disability.

On the issue of whether Borzak suffered an adverse employment action because of her disability, Borzak fails to present any evidence to suggest that she was terminated because of her

medical condition.  In fact, Borzak's testimony established just the opposite.  She testified that she had suffered from coronary artery spasms throughout her tenure with the City, and that she had been transported from work by ambulance on at least two occasions.  (Borzak Deposition pp. 166, 168, 190.)  The evidence further establishes that Defendants had accommodated her when she was having an episode.  (*Id.*)  The evidence does not suggest that Borzak was terminated because of her condition.  The fact that her supervisor, Heller, would tell her to go home after an episode does nothing to change this analysis.  (Borzak Deposition p. 169, 171.)  Borzak came forward with no evidence to suggest that Defendants had a pattern or practice of terminating disabled workers.

**E.**   **Borzak Has Failed to Establish a Viable Claim for Discrimination or Retaliation for Her Use of FMLA Leave.**

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2).  A claim under section 2615(a)(1) or (2) is referred to as a "retaliation" or a "discrimination" claim.  *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). "[T]he FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA."  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007).  "To succeed on a FMLA retaliation claim, a plaintiff must show that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'"  *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)).  The *McDonald Douglas* burden shifting analysis is applicable to a discrimination claim brought under the FMLA.  Therefore, if plaintiff makes a prima facie showing of those factors, the employer must then "articulate some

legitimate, non-discriminatory reason for its decision." *Lichtenstein*, 691 F.3d at 302.  If the employer can do so, the burden then switches back to the plaintiff to point to some evidence, direct or circumstantial, from which a factfinder could reasonably disbelieve [the employer's] articulated legitimate nondiscriminatory reason for its decision.  *Id.*

As previously mentioned, Borzak's claim fails because she cannot carry her evidentiary burden of establishing pretext under the *McDonnell Douglas* analysis.  Borzak further fails to causally connect her use of FMLA leave on January 3, 2019 to her termination on January 4, 2019.  The time-line of relevant facts establishes that Borzak submitted her provisional request for FMLA leave along with a doctor's note on September 28, 2018 which was granted.  (SMF ¶ 11.)  However, Defendants had opened their investigation into the MusikFest incident in August 2018 well before Borzak made any provisional request for FMLA leave.  The decision to terminate her employment was made in October or November of 2018 well before Borzak actually took any FMLA leave on January 3, 2019.  Therefore, she cannot establish that she was terminated for invoking her rights under the FMLA.

## IV.   CONCLUSION:

For the reasons stated herein, the Defendants' motion for summary judgment will be granted, and the Complaint will be dismissed.

BY THE COURT:

　 /s/ John Milton Younge　
Judge John Milton Younge